ALCHEMY II, INC., a California Corporation, Plaintiff,

v.

YES! ENTERTAINMENT CORPORATION, a California Corporation, Defendant.

No. CV 93–4887 WJR (JRx).

United States District Court, C.D. California.

Feb. 22, 1994.

**562**

Lewis Anten, Dorie Choderker, Lewis Anten, A Professional Corp., Encino, CA, Howard L. Rosoff, Rosoff, Schiffres & Barta, Los Angeles, CA, for plaintiff.

Chris R. Ottenweller, Brown & Bain, Palo Alto, CA, for defendant and moving party.

ORDER DENYING PLAINTIFF'S MOTION TO DISQUALIFY BROWN & BAIN, AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### MEMORANDUM AND ORDER

REA, District Judge.

This action came on for hearing January 10, 1994, before the Court, the Honorable William J. Rea presiding, on (1) Plaintiff Alchemy II's Motion to disqualify the law firm of Brown & Bain as counsel for defendant Yes! Entertainment and (2) defendant Yes! Entertainment's Motion for Summary Judgment. Chris Ottenweller appeared for defendant and moving party, Yes! Entertainment Corp. Lewis Anten and Howard Ro-soff appeared for plaintiff, Alchemy II, Inc. After full consideration of the authorities submitted by the parties and oral argument of counsel, the Court hereby denies plaintiff's motion to disqualify and grants defendant's motion for summary judgment.

### I. FACTUAL BACKGROUND

Alchemy is the creator and owner of all rights in an animated, talking, plush teddy bear named "Teddy Ruxpin." Teddy Ruxpin moves his mouth and eyes in synchronization with a specially programmed audio cassette embedded in his back. From approximately 1985 to 1987, Teddy Ruxpin was marketed by Worlds of Wonder ("WOW"), a company founded by Don Kingsborough. At present, Teddy Ruxpin is sold through Hasbro, Inc., and its sister corporation Playskool, Inc. Teddy Ruxpin has been a huge success, providing the inspiration for an animated cartoon series. He has also appeared in shows, parades, and advertisements worldwide.

Yes! Entertainment Corp. ("Yes!") has recently developed and marketed a plush, talking teddy bear named "TV Teddy." TV Teddy works in conjunction with special videotapes, and a "talk box" which is attached to a video cassette recorder. Through this video technology, TV Teddy "interacts" with scenes appearing on the television screen. He responds to characters in the special videotapes, often answering questions or singing verses of songs. To perform, he must be kept within a short distance—approximately twenty feet—of his "talk box."

The president and founder of Yes! is Don Kingsborough, the same man who originally marketed Teddy Ruxpin for Alchemy, through Worlds of Wonder. Alchemy's complaint against Yes! alleges seven causes of action: (1) copyright infringement under 17 U.S.C. § 501; (2) trade dress infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (3) false designation of origin under the Lanham Act; (4) infringement of federally registered trademarks under 15 U.S.C. § 1114(1); (5) unfair competition under California Business and Professions Code § 17200 *et seq.;* (6) trade dress and trademark infringement under the common law; and (7) dilution of trademark

and injury to business reputation under California Business and Professions Code § 14330.

From 1985 to 1988, the law firm of Brown & Bain represented Don Kingsborough and WOW. In March of 1985, WOW and Alchemy entered into a Development and Marketing Agreement ("the License Agreement") under which Alchemy granted WOW the exclusive right to manufacture and sell Teddy Ruxpin in exchange for royalties on sales.

As the exclusive licensee, WOW was entitled to take the legal action necessary protect the Teddy Ruxpin copyrights. The License Agreement also contained a specific grant of this right, providing that:

> [i]f the licensor shall not institute suit on account of [any infringement of the copyrights] within 20 days after receiving knowledge thereof, the Licensee may, with the consent of the Licensor, which consent will not be unreasonably withheld, institute suit or take action, in its own name of in the Licensor's name, on account of any such infringements or limitations, and the Licensor agrees to cooperate with the Licensee in the event the infringement substantially adversely affects the Licensee's interests.

Plaintiff's Memorandum of Points and Authorities in support of its Motion to Disqualify at 5, fn. 2.

Shortly after the initial licensing agreement was entered into, the parties became aware that certain former partners of Alchemy had potential claims to rights in Teddy Ruxpin, thus jeopardizing WOW's claim to exclusive use of the copyrighted material. Because of potential lawsuits, the parties negotiated an amendment to the Agreement which provided that WOW could deduct from its royalty payments to Alchemy any attorney's fees arising from suits by these former partners. Two such suits were filed, *Kowalski v. Worlds of Wonder, et al.,* No. CV 86–8710 HHS (C.D.Cal.1986), and *Burnett v. Forsee, et al.,* No. CV 87–1824 FFF (C.D.Cal. 1987). Although Alchemy initially disputed its liability for these sums, WOW deducted the costs and fees it incurred in these suits pursuant to the amendment. *See* Exhibits 15–17 to Plaintiff's Motion to Disqualify.

During the license period WOW, again represented by Brown & Bain, brought two lawsuits against unrelated third parties who were distributing audio cassette tapes for use with Teddy Ruxpin. Alchemy declined to file actions against these alleged infringers, and instead informed WOW that WOW could "institute suit ... at its own expense in accordance with [the] development and marketing agreement." Lagod Decl. ¶ 14; Exhibit D to Defendant's Opp. Alchemy did, however, cooperate in the prosecution of these cases by having two of its employees, Larry Larsen and Darwin Thompson, assist in the analysis of the infringing tapes. These employees also provided information about the mechanical operation of Teddy Ruxpin.[1] WOW successfully defended the Teddy Ruxpin copyrights in these actions.[2]

Throughout the license period, Alchemy was represented by in-house counsel, and, at times, by separate retained counsel as well. Alchemy was not a named party in any of the suits brought by WOW to protect the Teddy Ruxpin copyrights. Brown & Bain continues to represent Don Kingsborough and his new company, Yes! Entertainment Corporation, the defendant in the present lawsuit.

## II. DISCUSSION

### A. Motion to Disqualify

Alchemy claims in the instant motion to disqualify Brown & Bain that (1) an attorney

---

1. Yes! maintains that all of the information provided by Alchemy was revealed in open court through filed declarations and sworn testimony, and that Brown & Bain was never given any confidential information about Alchemy's business or its products. Alchemy claims that proprietary information was disclosed, but provides no examples for the Court to evaluate.

2. Another action, *Worlds of Wonder v. Galactic Enterprises, Inc.,* involved facts more akin to those of the instant action than those of the audio cassette cases. In *Galactic Enterprises,* WOW was suing a company that manufactured and sold an animated bear. However, the suit settled less than a month after it was filed, so there is no indication, or any allegation by Alchemy, that Alchemy provided any confidential information to WOW or Brown & Bain with regard to that action.

client relationship existed between Brown & Bain and Alchemy by virtue of WOW's prosecution of WOW's own rights as exclusive licensee of the Teddy Ruxpin copyrights, (2) that confidential information was given to Brown & Bain as a result of this relationship, and (3) that the present lawsuit therefore requires Brown & Bain to take a position adverse to a former client on issues related to this earlier representation.

Rule 3–310(E) of the Rules of Professional Conduct of the State Bar of California prevents an attorney from accepting employment "without the informed consent of . . . the former client where, by reason of the representation . . . of the former client, the [attorney] has obtained confidential information material to the employment." Rule 3–310 only becomes applicable if an attorney-client relationship is established. *In re Lee G.*, 1 Cal.App.4th 17, 27, 1 Cal.Rptr.2d 375 (1991) (the rule "never becomes applicable where the party seeking the attorney's disqualification fails to establish that such party was or is 'represented' by the attorney 'in a manner giving rise to an attorney-client relationship.' " (citation omitted)). Once such a relationship is established, a presumption that confidential information was shared with the attorney may arise where there exists a substantial relationship between the prior and present representation. *See, e.g., Global Van Lines, Inc. v. Superior Court,* 144 Cal. App.3d 483, 192 Cal.Rptr. 609 (1983).

Alchemy argues that Brown & Bain's former representation of WOW, in which the firm sought to protect the Teddy Ruxpin copyrights owned by Alchemy and licensed to WOW, effectively made Brown & Bain Alchemy's attorney. Alchemy presents no legal authority for the proposition that the attorney for a licensee defending its own contractual rights is presumed to represent the licensor as well. In fact, there is some analogous authority which suggests the opposite. In *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 836 F.2d 1332 (Fed.Cir.1988), the Federal Circuit had to decide whether two attorneys who had prosecuted a patent for one company but later represented another company seeking to have the patent invalidated, should be disqualified under Canon 4 of the American Bar Association Code of Professional Responsibility for failing to "preserve the confidences and secrets of a client." *Id.* at 1333. Medtronic, the assignee of the patent, moved to disqualify the attorneys on the grounds that Medtronic was, essentially, the attorneys' former client. The Federal Circuit rejected this argument, finding that "Medtronic was never a client . . . because the assignment of a patent does not transfer an attorney-client relationship." *Id.* at 1336.

Alchemy attempts to distinguish *Telectronics* by pointing out that in the case at bar Alchemy and Brown & Bain had contact— i.e., some sort of relationship—during the copyright litigation, whereas in *Telectronics* the assignee of the patent had no prior relationship with the prosecuting attorneys. The Court agrees that this distinction would be material *if* that prior relationship rose to the level of an attorney-client relationship. In other words, if Alchemy relayed confidential information to Brown & Bain that was not made public in one of the former actions and was not otherwise discoverable in this case, and if such information is relevant to the causes of action presently stated against Yes!, then the Court could infer an attorney-client relationship. In such a situation, Brown & Bain could be characterized as "switching sides," and Alchemy would be actually prejudiced by Brown & Bain's defense of this action. However, Alchemy has made no such allegations, and Yes! has provided declarations to the contrary.[3]

Alchemy next argues that it would be inconsistent and unfair for Brown & Bain to have defended the Teddy Ruxpin copyrights in previous actions and to now seek to limit the scope of those rights. Alchemy provides no authority for its proposition that an attorney may never represent different positions on an issue. The *Telectronics* case is in-

---

**3.** Moreover, the parties agree that the prior litigation concerned Teddy Ruxpin's audio cassette mechanism and the encoding of the special cassettes used to make the toy function properly.

The earlier cases did not involve the Bear's outward appearance or audiovisual performance. Thus, the information Alchemy shared with WOW is irrelevant to the instant case.

structive here as well. In *Telectronics*, the panel refused to disqualify the attorneys who prosecuted the patent at issue from later attacking its validity. "The bottom line," the court stated, "is that attorneys represent *clients* —not legal positions or patents." *Id.* at 1338.

■ Finally, Alchemy argues· that WOW, as licensee to Alchemy, owed Alchemy a fiduciary duty to protect the copyrights and other property licensed to WOW, and further, that Brown & Bain, as WOW's attorneys, maintained a like duty. This is simply a misstatement of the facts. The License Agreement gave WOW the *right* to sue to protect its interest in the Teddy Ruxpin copyrights, but imposed no obligation that it do so. In fact, a letter from Alchemy to WOW concerning the previous instances of infringement indicated that Alchemy did not intend to pursue its own right to protect the copyrights, and that WOW "could [do so] at its own expense." Lagod Decl. ¶ 14; Exhibit D to Defendant's Opp. This negates any inference that a fiduciary relationship existed between Alchemy and WOW.[4]

■ The Court finds that the present situation is closely analogous to that in *Telectronics*. Alchemy did not become a client of Brown & Bain by virtue of the fact that it licensed its copyrights to WOW.[5] Thus, Alchemy was not a "former client," and the Rules of Professional Conduct do not require disqualification of Yes!'s counsel of choice in this matter. Moreover, Alchemy has suffered no actual prejudice by virtue of Brown

& Bain's representation of Yes!. For these reasons, the Motion to Disqualify is denied.

## B. Motion for Summary Judgment

### 1. The Standard for Summary Judgment

■ Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Summary judgment may only be granted, however, where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987).

■ To survive the motion, the nonmoving party need only present evidence from which a jury might return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). At least some significant probative evidence tending to support the pleading must be produced. *T.W. Electrical Service v. Pacific Electrical Contractors*, 809 F.2d 626, 630 (9th Cir.1987); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The nonmoving party may not rest on the mere allegations of the pleadings. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir.1989). The mere

---

**4.** Alchemy also points to some language in the License Agreement stating that the two parties will "hold in a fiduciary capacity for the other's benefit ... any trade secrets or confidential information." Plaintiff's Motion at 4, fn. 1. This language is typical of contractual non-disclosure provisions, but does not create a fiduciary relationship between the two parties that would transform WOW's attorneys into Alchemy's attorneys. WOW and Alchemy were often on opposite sides of the bargaining table, such as when they entered into the License Agreement, and later when Alchemy disputed liability for Brown & Bain's fees under the amended Agreement. Given that Brown & Bain represented WOW *against* Alchemy in many negotiations, it seems unlikely that the firm could be considered any type of legal advisor to Alchemy.

**5.** Alchemy makes much of the fact that it "paid WOW's attorney's fees" in the cases brought against WOW by the former partners of Alchemy. This is a misstatement of the facts. As discussed in the background section of this memorandum and order, these fees were deducted by WOW from the royalties it owed Alchemy pursuant to a specific contractual provision of the amended License Agreement. In fact, Alchemy initially disputed any liability for these sums. Thus, Alchemy cannot now claim that this payment of funds to WOW constituted a payment of fees to Brown & Bain that established an attorney-client relationship between them.

existence of a scintilla of evidence in support of the respondent's position will be insufficient; there must be evidence on which the jury could reasonably find for the respondent. *Anderson*, 477 U.S. at 249, 252, 106 S.Ct. at 2510, 2512.

As a preliminary matter, Alchemy requests that the Court decline to rule on the instant summary judgment motion, pursuant to Fed. R.Civ.P. 56(f), because no discovery has yet been conducted in the case.[6] The Court denies this request on two grounds.

█ First, the lack of discovery in this matter is attributable to the conduct of plaintiff. Alchemy maintains that it declined to take any discovery because it knew that it was going to file a motion to disqualify defendant's attorneys. Expecting that such motion would be granted, Alchemy concluded that any discovery it conducted would be a waste of time, because it would have to duplicate its efforts at a later date with new opposing counsel. This suit was filed in August. Alchemy did not file the motion to disqualify until *after* defendant had filed its motion for summary judgment at the end of November. Alchemy provided no excuse in its papers or at oral argument for this delay, which obviously prejudiced the defendant because Yes! was actively preparing its motion for summary judgment. Moreover, Yes! contends that Alchemy delayed for the improper purpose of leaving a "cloud" over Yes!'s new product throughout the all-important Christmas Season. Although the Court is not inclined to find that Alchemy's behavior was improper, it does conclude that Alchemy's own actions are responsible for the lack of discovery in this case.

Second, Alchemy has been unable to demonstrate that discovery could possibly affect the Court's determination, as a matter of law, that its copyright and trademark claims cannot stand. As discussed more fully *infra*, it

is clear from observation of the two products that they are not substantially similar, and are in fact so *dissimilar* that there can be no likelihood of confusion. Thus, discovery related to Yes!'s motives or "intent to copy"— the information Alchemy seeks—has no bearing on these claims.[7]

### 2. Copyright Infringement Claims (First Cause of Action)

█ To prevail on copyright claims at trial, a plaintiff must prove (1) that it owned the copyrights in question, (2) that defendant had access to the copyrighted material, and (3) that there is "substantial similarity" between the plaintiff's design and that of the allegedly infringing material. *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 900 (9th Cir. 1987); *Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir.), *cert. denied*, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 69 (1985). The Ninth Circuit has held that, "[a]lthough 'summary judgment is not highly favored on the substantial similarity issue in copyright cases,' *quoting Berkic*, 761 F.2d at 1292, it is appropriate if 'the court concludes that no reasonable jury could find substantial similarity of both ideas and expression between the works at issue.'" *Aliotti*, 831 F.2d at 900 (*quoting Frybarger v. International Business Machines Corp.*, 812 F.2d 525, 528 (9th Cir. 1987)).

For purposes of this motion for summary judgment, defendant Yes! concedes both Alchemy's ownership of the copyrights at issue and that Yes! had access to the copyrighted works. Thus, summary judgment on the copyright claim is appropriate only if the Court determines that no reasonable jury could find that the two animatronic bears are substantially similar.

█ The Ninth Circuit has developed a two part test for determining whether two works are substantially similar. *See Sid and*

---

6. Rule 56(f) provides that when

 it appear[s] from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or deposi-

tions to be taken or discovery to be had or may make such other order as is just.
Fed.R.Civ.P. 56(f).

7. Alchemy also claims that it needs discovery on its cause of action for unfair competition based on Cal.Bus. & Prof.Code §§ 17200 et seq. This assertion will be discussed in more detail in the section on that particular cause of action.

*Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157 (9th Cir. 1977). The "extrinsic test," used to determine whether two *ideas* are substantially similar, is an objective test. This objective prong is evaluated by listing and evaluating specific points of similarity. *Id.* at 1164. The "intrinsic test" is used to compare forms of expression, and is mostly subjective. This prong of the substantial similarity test "depends on the response of the ordinary reasonable person." *Id.* In the case at bar, Yes! admits that both Teddy Ruxpin and TV Teddy are founded on the same idea—that of a talking, plush teddy bear. Therefore, the extrinsic test is satisfied, and the Court need only address the intrinsic, or "total concept and feel" test. *See Aliotti,* 831 F.2d at 902; *Krofft,* 562 F.2d at 1167.

In *Aliotti,* the Ninth Circuit further defined the intrinsic test, stating that "[n]o substantial similarity of expression will be found when 'the idea and its expression are ... inseparable,' given that 'protecting the expression in such circumstances would confer a monopoly of the idea upon the copyright owner.'" 831 F.2d at 901 (quoting *Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 742 (9th Cir.1971)). The panel went on to state that

> [t]o the extent that it is necessary to determine whether similarities result from unprotectable expression, it is appropriate under *Krofft's* intrinsic test to perform an analytical dissection of *similarities.* Although even unprotectable material should be considered when determining if there is substantial similarity of expression, no substantial similarity may be found under the intrinsic test where analytic dissection demonstrates that all similarities in expression arise from the use of common ideas.

*Id.* (citations omitted).

The facts of the *Aliotti* case are instructive, as they closely parallel the situation in the instant case. At issue in *Aliotti* were two sets of stuffed dinosaurs. In finding that summary judgment in favor of the defendant

was appropriate, the district court described the competing toys as follows:

> The dolls at issue here derive from the same idea of stuffed dinosaur dolls, but they differ in the expression of that idea. The "Ding–A–Saur" dolls depict a sleepy eyed, "dingy" dinosaur with exaggerated facial and other anatomical features. The stitching on each dinosaur is raised and distinctive, and generally, they are constructed of a distinctive suede-like material. By contrast, the Dakin "Prehistoric Pet" dolls are more accurate depictions of dinosaurs; the dolls reflect less personality. They have no sleepy-eyed look or exaggerated features. They are constructed of a plush material, and the stitching is hidden.

*Id.* at 900. The court found that as a matter of law, "considering the total concept and feel of the products, the allegedly infringing dolls are not copies of the plaintiff's 'Ding–A–Saurs.'" *Id.*

The Court of Appeals upheld the district court's finding of no substantial similarity. In doing so, the panel noted that no copyright protection "may be afforded to the idea of producing stuffed dinosaur toys or to elements of expression that necessarily follow from the idea of such dolls." *Id.* at 901. The plaintiff, therefore, could "place no reliance upon any similarity resulting from either the physiognomy of dinosaurs or from the nature of stuffed animals." *Id.* See also, *Frybarger,* 812 F.2d at 529–30 (quoting *Atari, Inc. v. North American Philips Consumer Elecs. Corp.,* 672 F.2d 607, 616 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982) (finding that certain video game features are "as a practical matter indispensable, or at least standard, in the treatment of a given [idea]".)).[8]

A more recent Ninth Circuit opinion, similarly applying the intrinsic test in a copyright infringement case, also upheld a grant of summary judgment in favor of the defendant. In *Pasillas v. McDonald's Corp.,* 927 F.2d 440 (9th Cir.1991), the district court was presented with two "man-in-the-moon" face masks. Both works were three dimensional,

---

8. The *Aliotti* court applied the intrinsic test "through the eyes of" the intended audience, i.e.

children; still finding that no reasonable child or adult would find the dinosaurs similar.

white crescent moons that were worn over a person's head. The masks had different facial expressions, plaintiff's presenting an older, careworn visage, while defendants was young and "upbeat." The district court, following *Aliotti*, found that the elements common to both masks—the crescent shape, color, depiction of a human face at the center of the mask, and the design enabling the mask to be worn over a person's head—were all derived from the common idea of a mask depicting the man-in-the-moon. Thus, plaintiff could not rely on these elements to satisfy the intrinsic test, and summary judgment was properly granted.

 In the present case, Alchemy argues that there are many similarities between the two talking teddy bears, so that a reasonable observer would find the two substantially similar. The elements of similarity that are identified are: (1) the plush material, (2) both bears wear cloths, (3) the shirts of both bears contain a crest with the trademark and name of the individual bear, (4) that each bear has a pear-shaped head that is larger on the bottom than on the top, (5) the noses and mouths of both bears protrude and are of similar shape, and (6) the noses and mouths, the insides of the ears, and the soles of the feet of both bears are of a light color which contrasts with the rest of the fur.[9]

All of these features, with the possible exception of the pear-shaped head, are derived from the common idea of a talking, plush teddy bear. The material is common to most stuffed toys. Many stuffed animals wear clothes, (they are "as a practical matter ... standard," *Frybarger*, 812 F.2d at 529–30). Many toys contain a visible trademark. In this case, placing the mark on the bears' clothing is only logical, and in fact, the crests are very different and placed in different positions on each bear's shirt. The protruding noses are functional—they emphasize the animation of the mouth. Such snouts can be seen on any number of animatronic animals, including the talking bears in venues such as Disneyland or the Chuck-e-Cheese chain of restaurants. The contrasting paw and ear colors are standard on teddy bears everywhere. Alchemy may not rely on any of these standard or functional features to demonstrate substantial similarity.

There is some question about whether TV Teddy needs to have a pear shaped head, and whether such a shape is protectable or not. First, although the shape is somewhat distinctive, it is not unique. There are only a limited number of head shapes a teddy bear could have: round, oval, wider on the bottom than on the top (pear shaped), or wider on the top than on the bottom. Thus, this shape probably is not protectable. Yes! argues that, even assuming that the shape is distinctive, it is functional because all of TV Teddy's mechanical parts are housed in his head, and the pear shape allows for the most interior space without making the head too large. This functionality issue is a factual question, and one which Alchemy has not been able to address adequately because there has been no discovery in this case. Thus, Alchemy argues that the motion is premature, and must be denied. However, even assuming that the head shape is distinctive *and* nonfunctional, this evidence of similarity is *de minimis*, and insufficient to preclude a grant of summary judgment. *All* of the other similarities in this case involve non-protectable elements common to any talking teddy bear.

Although a list of differences is not relevant to application of the intrinsic test, it does demonstrate why an observer, adult or child, would not find the two bears similar in overall appearance or performance. The bears have vastly different coloring. Their clothing is different: Teddy Ruxpin wears a tan, sleeveless top over a reddish brown "jumpsuit," while TV Teddy wears a purple colored sweatshirt with brightly colored trim,

---

9. The plaintiff also identifies other features which it claims are "strikingly similar," such as the eyes of the bears, their "stance," and the color of their fur. In reality, these features are extremely *dissimilar*. Teddy Ruxpin's eyes are oriented horizontally and are dark brown, giving him a somewhat sleepy expression, while TV Teddy's are oriented vertically and are blue, so that he appears alert. Teddy Ruxpin's legs dangle, so that he may "stand" or be placed in a sitting position, while TV Teddy is fixed in a seated posture. Teddy Ruxpin's fur is a dark, reddish-brown, while TV Teddy's is a light tan that is almost grey. These feature cannot help plaintiff establish similarity.

and no "bottoms" at all. Their eyes are oriented in different directions and are of different colors, Teddy Ruxpin's being brown, while TV Teddy's are blue. TV Teddy has a tail, Teddy Ruxpin does not. Teddy Ruxpin has a tuft of fur on his head, TV Teddy does not. Their body shapes are entirely different, with the proportions of hands, feet, torso, head, and ears varying greatly. Finally, the audiovisual presentation of each toy is significantly different. The bear's voices are dissimilar. Teddy Ruxpin "narrates" a story, while the voices and sounds of the rest of the story are also broadcast from his torso. TV Teddy, on the other hand, interacts with a video story. Sometimes he addresses a TV character, while at other times he speaks to a child companion. Only his own voice emanates from his body.

The only true similarities between Teddy Ruxpin and TV Teddy are that they are both talking teddy bears. The idea of such a toy is not protectable under the copyright laws of the United States. Thus, summary judgment in favor of defendant Yes! is appropriate.

### 3. Trademark Infringement Under the Lanham Act and at Common Law (Fourth Cause of Action)

■ Alchemy alleges that Yes!'s use of the name "TV Teddy" infringes its four registered trademarks. Each of the registered marks contains the words "Teddy Ruxpin." [10] The only overlap between Yes!'s mark and Alchemy's marks is the word "teddy." Yes! argues very persuasively that "teddy" is a generic term that cannot be protected by trademark law, so that the word marks at issue cannot be confusingly similar.

■ To prevail on a trademark claim, a plaintiff must demonstrate (1) ownership of a valid mark, (2) use by the defendant of the same or similar mark, and (3) that there is a likelihood of confusion.[11] *See HMH Publishing Co. v. Lambert*, 482 F.2d 595, 598 (9th Cir.1973). Summary judgment is appropriate where there is no valid mark, or where "the court is satisfied that the ... marks are so dissimilar that no question of fact is presented." *Universal City Studios, Inc. v. Nintendo*, 746 F.2d 112 (2d Cir.1984); *see also Kellogg Co. v. Pack'em Enterprises, Inc.*, 951 F.2d 330 (Fed.Cir.1991).

Although it is clear that Alchemy's "Teddy Ruxpin" marks are valid, Alchemy also attempts to claim the generic word, or in this case name, "Teddy," as a valid mark. The company presents evidence that many people refer to the bear by this nickname, supposedly demonstrating both the use and strength of the mark. However, this claim of a proprietary interest in the word "teddy" by itself is absurd. Almost every child has a "teddy." Toy bears have been referred to as "teddy bears" for over half a century. Moreover, Yes! presents evidence in the form of a declaration of one of its attorneys that he has personal knowledge of at least 180 registered marks incorporating the word "teddy." "Teddy" is a generic term which Alchemy cannot prevent others from using, even when the word is associated with a product in direct competition.

Because "teddy" is the only word common to the wordmarks used to name the two bears, it is clear that TV Teddy and Teddy Ruxpin are not at all similar. *See, e.g., Team Central, Inc. v. Xerox Corp.*, 606 F.Supp. 1408 (D.Minn.1985) (holder of "Team Central" mark may not prevent others from using the generic word "team"). Thus, it is proper for the Court to grant summary judgment in favor of Yes! on Alchemy's claims for trademark infringement under both the Lan-

---

**10.** The marks are "Teddy Ruxpin," "Teddy Ruxpin Fan Club," "The Adventures of Teddy Ruxpin," and "The World of Teddy Ruxpin."

**11.** In evaluating whether there is a likelihood of confusion between trademarks or trade dress, the Ninth Circuit has provided a non-exclusive list of relevant factors. These factors are: (1) the strength of the mark, (2) the proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, and (6) the degree of care likely to be exercised by the purchaser. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979). As discussed *infra*, the marks at issue in this case are so dissimilar that the Court need not address the other factors.

ham Act and at common law.[12]

4. Trade Dress Infringement and Unfair Competition under the Lanham Act, 15 U.S.C. § 1125(a) and at Common Law (Second, Third, and Sixth Causes of Action)

■ To prevail on a claim of trade dress infringement a plaintiff must demonstrate that (1) its trade dress is non-functional, (2) is inherently distinctive or has acquired secondary meaning in the relevant community, and (3) that defendant's imitation of the dress is likely to cause confusion. *See, e.g., First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir.1987); *Two Pesos v. Taco Cabana,* —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

Alchemy's complaint makes it evident that plaintiff considers Teddy Ruxpin's trade dress infringed by Yes! by virtue of the toys' alleged similarity, but in Alchemy's opposition to the instant motion it also argues that the packaging of the two bears is likewise confusingly similar. These two considerations will be addressed in turn.

a. The Product as Trade Dress

This claim is, in essence, a repeat of the copyright infringement claim. As discussed above, the products are not substantially similar. Therefore, the likelihood of confusion as to the source of each toy based on its looks or overall audiovisual presentation is minimal.

b. The Packaging as Trade Dress

■ Alchemy points to the several alleged similarities between the packaging of Teddy Ruxpin and the packaging of TV Teddy. First, Teddy Ruxpin's box contains the phrase "World's First Animated Talking Toy," while TV Teddy's says "Television's First Interactive Talking Friend." Second, the back of the Ruxpin box has a photograph of a blond girl with a white ribbon in her hair. She is holding Teddy Ruxpin is her lap, and is apparently reading "to" or "with" him. There is a photograph on the side of the TV Teddy box of a brunette girl with a red ribbon in her hair. The child is hugging TV Teddy. Third, the color of the box that TV Teddy is packaged in and the color of one of the many children's books containing a Teddy Ruxpin story are "virtually identical." These "similarities" are insufficient to demonstrate a likelihood of confusion.

■ First, the two phrases complained of are only similar in that they advertise a "talking" toy that is a "first" on the market. These are functional elements of trade dress. Second, the only unnecessary similarity between the photographs of the two little girls is that each wears a hair ribbon. The children do not look alike, and are posed differently. Finally, comparing the color of a Teddy Ruxpin book with the color of TV Teddy's

---

**12.** Alchemy claims that the marks, and indeed the bears themselves, must be similar because there has been actual confusion in this case. Alchemy's evidence of confusion consists of the following: (1) fifteen phone calls received by Hasbro (the company currently marketing Teddy Ruxpin) inquiring as to where consumers could purchase TV Teddy, (2) the declaration of Ann Stockman stating that another person, a designer named Ravi Sawhney, "was shocked to learn that TV Teddy was not Teddy Ruxpin," Stockman Decl. 9:10–12, and (3) various newspaper articles comparing the two toys which refer to TV Teddy as an improved or newer "version" of Teddy Ruxpin.

All of this evidence is inadmissible hearsay. However, even if the Court were to consider it, the evidence does not demonstrate significant actual confusion. First, fifteen phone calls inquiring about a product during the Christmas season is *de minimis,* and in fact to be expected. Hasbro was previously the only distributor of a talking bear. It is quite logical for a consumer to assume that a more advanced entry into the market was manufactured by the same company. Second, the confusion of one designer, reported by a third person, is hardly compelling evidence of a likelihood of confusion among children and their parents (the target audience). Finally, the newspapers articles are simply "reviews" of the new bear, wherein comparison of the product with the competing toy was inevitable.

As an alternative grounds for overcoming summary judgment on the issues of trademark and trade dress infringement, Alchemy again raises its Rule 56(f) argument. Alchemy contends that the foregoing is insufficient only because it has not had sufficient opportunity to gather evidence of actual confusion. The Court disagrees. Even if Brown & Bain had been improperly representing Yes! in this case, most of the potential evidence of actual confusion, for example the alleged inquiries to Hasbro about TV Teddy, is within Alchemy's control. Thus, Alchemy should have been pursuing this evidence regardless of its desire to have Brown & Bain disqualified.

package is disingenuous. There are so many Teddy Ruxpin products on the market that allowing Alchemy to protect all of the colors it has used would be tantamount to requiring Yes! to package TV Teddy in a brown paper bag. Again, even granting that Teddy Ruxpin's overall trade dress is distinctive and has acquired strong secondary meaning, Yes! has not adopted confusingly similar dress, and summary judgment on these claims is appropriate. Furthermore, where there is no likelihood of confusion, Yes! cannot be said to have competed unfairly in the market based on the use of a similar mark or trade dress. Thus, Alchemy's unfair competition claims under the Lanham Act and at common law also cannot withstand the motion for summary judgment.

### 5. Alchemy's Unfair Competition Claim under California Business & Professions Code § 17200 (Fifth Cause of Action)

According to its opposition papers, Alchemy's claim for unfair competition under Cal. Bus. & Prof.Code § 17200 is premised on the allegation that Yes! demonstrated a prototype TV Teddy at a trade show, took orders for this product, and then shipped a slightly modified, final version of the toy.[13] These alleged facts do not appear anywhere in Alchemy's complaint. Thus, the first notice Yes! had of these charges occurred over three months after the complaint was filed, and after it had filed a motion for summary judgment. Moreover, Alchemy does not present any legal authority that demonstrates that such behavior, if it in fact occurred, would be a violation of the code. Finally, there is no allegation that anyone,

least of all Alchemy, was harmed by this behavior.[14]

### 6. Alchemy's Claim for Dilution of Trademark (Seventh Cause of Action)

 Any claim for trademark dilution must be premised on a defendant's use of a mark that is confusingly similar to the plaintiff's mark. As discussed previously, Teddy Ruxpin and TV Teddy are not similar, their respective word marks are not similar, and their packaging is not similar. Thus, Alchemy's dilution claim cannot stand.

For the reasons stated above, the Court grants Yes!'s motion for summary judgment on all causes of action in the complaint.

IT IS SO ORDERED.

---

**13.** Section 17200 states, in pertinent part, that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...." Cal.Bus. & Prof.Code § 17200.

**14.** At oral argument, Alchemy stated for the first time that it's claim was that the Bear demonstrated at the trade show was substantially similar to Teddy Ruxpin, even if the TV Teddy which was shipped was not. Thus, Alchemy contends, it was damaged because potential Teddy Ruxpin sales were diverted to TV Teddy. Alchemy fur-

ther argues that it could not prove this allegation at the present time because of the lack of discovery (again asserting that the Court should refrain from ruling on this issue pursuant to Fed. R.Civ.P. 56(f)). As stated earlier, this lack of discovery is the fault of plaintiff. Furthermore, because Yes! had no notice of these allegations, it had no reason to provide the Court with evidence to the contrary. For these two reasons, the Court finds that it is appropriate to rule on this cause of action as well as the others present in this case.