**SEGA ENTERPRISES LTD; Sega of America, Inc, Plaintiffs,**

v.

**MAPHIA, a business of unknown structure; PARSAC, a business of unknown structure; PSYCHOSIS, a business of unknown structure; Chad Scherman aka Chad Sherman aka "Brujjo Digital," and Does 2–6 aka "OPERATOR," "FIREHEAD," "LION," "HARD CORE," "CANDYMAN," all individually and d/b/a MAPHIA and PARSAC; Howard Silberg by his mother and next friend Ilene Silberg, aka "CAFFEINE," and Does 14–18 aka "APACHE," "MAELSTROM," "GAZZER," "PARANOID/CHRYSEIS," "DOOM" all individually and d/b/a PSYCHOSIS and PARSAC; Does 7–12; Does 19–25, Defendants.**

No. C 93–04262 CW.

United States District Court, N.D. California.

Dec. 18, 1996.

---

Neil A. Smith, Limbach & Limbach L.L.P., San Francisco, CA, for Sega Enterprises Ltd. and Sega of America, Inc.

Jeffrey B. Neustadt, San Francisco, CA, for Chad Scherman aka Chad Sherman aka Brujjo Digital.

ORDER GRANTING SUMMARY ADJUDI-
CATION OF LIABILITY AND A PER-
MANENT INJUNCTION WITH RE-
SPECT TO DEFENDANT SHERMAN

WILKEN, District Judge.

Plaintiffs Sega Enterprises, Ltd. and Sega of America, Inc., (collectively "Sega") filed this action for copyright infringement under 17 U.S.C. §§ 101 et seq., federal trademark infringement under 15 U.S.C. §§ 1051 et seq., federal unfair competition for false designation of origin under 15 U.S.C. § 1125(a), California trade name infringement under California Business and Professions Code §§ 14401 et seq. and California unfair competition under California Business and Professions Code §§ 14210, 17200–17203 against Defendant Chad Sherman and several other individuals operating on-line bulletin boards, and MAPHIA and other bulletin boards as businesses of unknown structure.[1]

This Court has jurisdiction over the causes of action arising under federal law pursuant to 28 U.S.C. § 1338(a), and has jurisdiction over the state causes of action pursuant to 28 U.S.C. §§ 1338(b).

Venue is proper in the federal district court where certain Defendants reside and where the alleged acts of trademark and copyright infringement occurred. 28 U.S.C. §§ 1391(b) and (c). Venue in the instant suit is proper in the Northern District of California.

After careful consideration of the parties' papers and the record as a whole, and good cause appearing, the Court GRANTS summary judgment regarding Sherman's liability for copyright infringement, federal trademark infringement, federal unfair competition for false designation of origin, California trade name infringement and California unfair competition. The Court also GRANTS Sega's request for a permanent injunction prohibiting further copying of SEGA games by way of the MAPHIA electronic bulletin board, or any bulletin board run by Sherman.

### STATEMENT OF FACTS

*I. Sega's business*

Sega[2] is a major manufacturer and distributor of computer video game systems and computer video game programs which are sold under the SEGA logo, its registered trademark. (Federal Registration No. 1,566,116, issued November 14, 1989). As part of its development process, Sega takes care to ensure the quality and reliability of the video game programs and products sold under SEGA trademarks.

---

1. Sega's complaint names as Defendants MAPHIA and PSYCHOSIS, bulletin boards run by Chad Sherman and Howard Silberg, respectively, PARSAC, a computer bulletin board network operated by Sherman and Silberg through the MAPHIA and PSYCHOSIS bulletin boards, as well as twenty-three Does. Sega's motion for summary judgment, however, refers only to Sherman and Silberg. The Court therefore makes no judgment with regard to the remaining Defendants. Unless Sega evidences an intent to prosecute the case against them, they will be dismissed when judgment enters in this case. With respect to Silberg, the Court notes that because he has filed for bankruptcy, this litigation with respect to him is stayed.

2. Sega Enterprises, Ltd. is a corporation organized and existing under the laws of Japan. Sega of America, Inc. is a California corporation.

Sega also owns the copyright for the game programs that Sega develops, and has federal copyright registrations for several video games, including Jurassic Park and Sonic Spinball.

The Sega game system consists of two components, the base unit game console, and software stored on video game cartridges which are inserted into the base unit. The base unit contains a microcomputer which, when connected to a cartridge and a television, permits an individual to play a video game stored on the inserted cartridge. The cartridge format is not susceptible to breakdown or erasure. Defective Sega cartridges are replaced by Sega.

Sega's game system is designed to permit the user only to play video game programs contained in Sega cartridges. The system does not permit the copying of video game programs. Sega does not authorize the copying or distribution of its video game programs on other storage media such as floppy disks or hard disks.

Sega takes steps to keep its methods of developing video game programs, its works-in-progress, and the codes of its released products confidential, and the employees and contractors who work with Sega sign non-disclosure agreements regarding their work. Video game programs which are in development are referred to as "pre-release" programs. During the development period, pre-release software may be stored on cartridges, floppy disks or hard disks for internal use by Sega. Upon completion of the program, however, the program is distributed only on cartridges.

## II. MAPHIA Bulletin Board

Sherman is the system operator for MAPHIA, an electronic bulletin board. An electronic bulletin board ("BBS") consists of electronic storage media, such as computer memories or hard disks, which are connected to telephone lines by modem devices, and are controlled by a computer. Users of BBSs can transfer information from their own computers to the storage media on the BBS by a process known as "uploading." Users can also retrieve information from the BBS to their own computer memories by a process

known as "downloading." Video game programs, such as Sega's video game programs, are among the kinds of information that can be transferred in these ways.

The software and computer hardware Sherman used to run MAPHIA is owned by him and located at his residence in San Francisco, California. The MAPHIA bulletin board is open to the public and has approximately 400 users who routinely download and upload files from and to the MAPHIA BBS. The users of this BBS are identified by a handle and a password. A handle is a pseudonym by which individuals are known to other users of the system. The password is not displayed to other users and is known only to the system operator and the authorized user.

The evidence shows that "Brujjo Digital" is the alias used by Sherman as the system operator of the MAPHIA BBS, and in communicating with others. For example, Sherman admitted that he was the system operator of the MAPHIA BBS, and the MAPHIA BBS indicates that Brujjo Digital is its operator.

## III. Evidence collected from the seizure

This action was initiated after Sega allegedly received an anonymous tip that Sherman was an operating computer BBS which contained and distributed pirated and unauthorized versions of Sega's video game software. Sega collected evidence of these activities by having a Sega employee gain access to the MAPHIA BBS under a pseudonym, using information supplied by an authorized user who was an informant.

Pursuant to the *ex parte* Temporary Restraining Order and Seizure Order issued by Judge Fern M. Smith of this Court on December 9, 1993, a search of Sherman's premises was conducted. Pursuant to the Order, Sherman's computer and memory devices were seized, the memory was copied, and the computers and other seized hardware were returned to Sherman, with the Sega games deleted.

Data from the MAPHIA BBS indicates that it is linked to another BBS called PSYCHOSIS, whose system operator is called

Caffeine. This data also indicates that Sherman and the MAPHIA BBS are part of or linked to a network of BBSs, called PARSAC (also spelled "PARSEC" by Sherman), for business purposes. A newsletter displayed on the MAPHIA BBS refers to MAPHIA as the "WorldHeadquarters" for a group called "PARSEC" of which PSYCHOSIS is the "USHQ." Sherman is the "acting world leader" of PARSAC. A message file located on Sherman's computer, authored by Brujjo Digital, states:

NOTES WORTHY OF MENTION:

... You probably noticed that I am taking over the World Leader Position and that's because I felt like I pulled alot of this together with ALOT ALOT of help from Caffeine ...

. . . . .

PARSEC VOICE MAIL BOXES:

I'm setting up a VMB system at my house for PARSEC ONLY! ... the kewl thing about it is that the VMB can page myself and Caffeine when an original game is ready for release or anything important comes up.

. . . . .

ADVERTISING CAMPAIGN:

As you know we have PARSEC TRADING CO. as our business that sells everything from Copiers to ... I'll have some Advertisements ready by the time I install Caffeine's REXX DOOR to handle Customer's Orders online at the !MAPHIA! like the system Caffeine runs on Psychosis ...

. . . . .

NEW MEMBERS:

... we are selling ... Super Magic Drives ... but me and Caffeine will handle all the business side of that ...

At the time it was seized, the MAPHIA BBS contained unauthorized copies of 12 Sega games developed by Sega, ten Sega-licensed games, and six Sega pre-release or "beta" version games, developed in-house by Sega. The copies of Sega's programs uploaded to and downloaded from the MAPHIA BBS are substantially similar to Sega's video game programs as stored in the cartridges

sold by Sega. Prior to the seizure, each of the Sega-developed and beta version games on the MAPHIA BBS was available for downloading by MAPHIA users who access the board through their own computers by modem telephone connections. Sega had U.S. copyright registration in at least two of the games found on the MAPHIA BBS, namely Jurassic Park and Sonic Spinball.

Sega games are generally listed on the MAPHIA BBS in a file area entitled "<<< !MAPHIA! >>> SEGA CONSOLES <<<." The games are identified by a "file descriptor" which includes the title of the game, the manufacturer, and either the word "SEGA" or "Sega," the same word that is in the SEGA registered trademark. Additionally, the SEGA trademark appears on the screen whenever a Sega game which has been downloaded from the MAPHIA BBS is subsequently played. Sherman acknowledged that the SEGA trademark is displayed when the downloaded games are played.

The directory of video game programs available on MAPHIA also contains numerous references to video game programs containing "patches" or "fixes." These words refer to user-introduced changes to problems which may have been introduced in the copying process or which existed in beta version games.

Printouts of the data on Sherman's BBS seized pursuant to this Court's Order and on-line data captured from Sherman's BBS show that the uploading and downloading of unauthorized copies of Sega's copyrighted video games was known to Sherman. Sherman acknowledges that users of the MAPHIA bulletin board were allowed to upload and download Sega games with the authorized password. A screen printout of user uploading and downloading statistics from his MAPHIA BBS shows that Sherman tracked, or at least had the ability to track, user uploads and downloads. Additionally, another message authored by Brujjo Digital and located on Sherman's BBS states:

Please UPLOAD *ALL* the missing CONSOLE Files NOT HERE from the time I closed the !MAPHIA! Oct 17th until up to now!! Time to get some free credits

for someone if you get them all in here and get me caught up.

Sherman also sold video game copiers, referred to as "Super Magic Drives" ("copiers"), through the MAPHIA BBS in collaboration with the PSYCHOSIS BBS, collectively known as PARSAC. Sherman's business plan as described by his alias "Brujjo Digital," states:

> As you know we have PARSEC TRADING CO. as our business that sells everything from Copiers to Modems to Hard Drives to Calling Cards (off the record, hehe), and even Pentium Chips now. So, the next step is a MEDIA BLITZ! ... I'll have some Advertisements ready ...

> Also, we are selling Super Wild Cards, Pro Fighter Q's and Super Magic Drives for AKIRA and that part of PARSEC will be dedicated for him but me and CAFFEINE will handle all the business side of that and paying him the money and dealing with the customers, etc.

According to a data file found on Howard Silberg's computer, Parsec Trading has the following policy:

> As you know, if you read the policies of PARSEC TRADING, each customer receives free-downloads up to ten (10) megabytes. This is so you can use your back-up unit and enjoy it! After your ten megabytes has been used up, you can donate $35 per month for a month of free-downloads, $200 for a year of free-downloads, or $500 for unlimited free-downloads.

A copier is necessary to play games which have been downloaded from the BBSs. The Super Magic Drive copier consists of a connector which plugs into the video game console, a receptacle which accepts video game cartridges, a main unit which contains a random access memory (RAM) to store games, and a floppy disk drive. A MAPHIA BBS user can download video programs through his or her computer onto a floppy disk and make copies with his or her computer or play those game programs through the adaptor drive. To play a downloaded game, the user places the floppy disk into the video game copier. The user can choose the "run program" option and run the video game program from the floppy disk without a video game cartridge.

The adaptor drive also allows the user to copy the contents of a game cartridge onto a floppy disk. The user plugs the video game copier into the game console and places a video game cartridge into the receptacle of the video game copier. The user then turns on the adaptor drive. Through a menu screen, the user can select the "dump" option which will permit the user to copy the contents of the cartridge to a floppy disk.

Sega has attempted to obtain additional information from Sherman through deposition and discovery. Sherman was deposed on March 1, 1994, at which time he refused to answer substantive questions by invoking his Fifth Amendment privilege.

## EVIDENTIARY OBJECTIONS

### I. Sega's Motion to Strike Peterson's First Declaration

Sega moves to strike Peterson's Declaration in Support of Opposition to Preliminary Injunction ("First Peterson Decl.")[3] arguing, among other things, that Peterson is not qualified as an expert regarding the subject matter of the declaration. Because Peterson's expertise is limited to computers generally and computer law,[4] the Court will disregard any opinions expressed outside this field. *LuMetta v. U.S. Robotics,* 824 F.2d 768, 771 (9th Cir.1987) (exclusion of expert testimony is justified where foundational facts demonstrating relevance or qualification are not established.) Further, the Court

---

**3.** Peterson's First Declaration is a narrative which mixes assertions of facts regarding Sherman's actions, opinions about the general state of computer games, bulletin boards, and the cyberpunk subculture, opinions about video game copiers, legal opinions on issues and interpretations of the statutes involved in this case, expert opinions about alleged tampering with seized electronic evidence in a similar case, and finally, a statement of "alarm" that a Japanese company

is "taking advantage of the United States Constitution on the one hand, and abusing it on the other." First Peterson Decl. p. 8.

**4.** The legal opinions are, of course, an improper subject of expert testimony, and are stricken. *See United States v. Brodie,* 858 F.2d 492, 496–97 (9th Cir.1988).

finds that because the only opinion expressed with respect to computers generally relates to alteration of files on another person's computer which was seized by Sega, and because Sherman has not alleged similar alteration of files in his case, the Court finds this opinion irrelevant. The Court GRANTS Sega's motion to strike Peterson's First Declaration.

## II. Sherman's Objections to Sega's Entry into MAPHIA

### A. Unclean Hands

■ Sherman complains that Yang gained access to MAPHIA under a pseudonym, and argues that such access amounts to unclean hands which should prevent summary judgment. The Court disagrees.

Yang's access to MAPHIA under the informant's pseudonym was consistent with all users' anonymous access. Thus, no misrepresentation occurred. Even characterized as misrepresentation, however, such actions do not provide a defense to copyright or trademark infringement. See, e.g., Reebok Int'l, Ltd. v. Jemmett, 6 U.S.P.Q.2d 1715, 1717, 1988 WL 106933 (S.D.Cal.1988) (no unclean hands where Reebok employee falsely represented name and occupation to get evidence of infringement).

### B. Violation of 18 U.S.C. § 2701(a)

■ Sherman argues that Sega's access to the MAPHIA BBS through use of a pseudonym constitutes a violation of the Stored Wire and Electronic Communications and Transactional Records Act, 18 U.S.C. § 2701(a). Sherman argues that, because a password in a security system is intended to protect the system itself as well as the user, the use of that password by someone other than the original user will compromise the security of the system and violate the intent of § 2701, which is to make systems "more secure." Declaration of Richard Peterson in Support of Defendant Sherman's Opposition to Summary Judgement ("Second Peterson Decl.") ¶ 14.

The Electronic Communications and Transactional Records Act makes it illegal to "intentionally access without authorization a facility through which an electronic communi-

cation service is provided." 18 U.S.C. § 2701(a). The Act contains an exception for access which is authorized by a user of an electronic service with respect to a communication of or intended for that user. 18 U.S.C. § 2701(c)(2).

Because the MAPHIA BBS is open to the public, and normally accessed by use of an alias or pseudonym, it would appear that Sega's employee's pseudonymous access was authorized. Thus, Sega did not violate the statute.

To the extent Sherman argues that the password system is intended to protect the system, this argument is unpersuasive. There is no evidence that the intent of requiring passwords is to protect the system from use by those other than the original user, nor does Sherman cite any support for his argument that all BBSs such as MAPHIA are closed and passwords are not transferable under industry practice. Sherman has also not provided any evidence that users of the MAPHIA system were informed or understood that passwords were not to be used by authorized third parties. Because Sherman has not provided any evidence or authority to support his argument, it must fail.

Furthermore, the Sega employee's access to or communication with the BBS was authorized directly or indirectly by a valid MAPHIA user. As such, it fits the exception carved out in Section 2701(c) and, therefore, no violation of 18 U.S.C. § 2701(a) took place.

### C. Violation of 18 U.S.C. § 2702

■ Sherman also argues that Sega violated 18 U.S.C. § 2702 by accessing the private e-mail of MAPHIA users and publishing parts of the e-mail in the Declaration of Jane Quayle Keene. Section 2702 provides that:

(1) a person or entity providing an electronic communication service to the public shall not knowingly divulge to another person or entity the contents of a communication while in electronic storage by that service; and

(2) a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity

the contents of any communication which is carried or maintained on that service.

On its face, the language of the statute does not apply to Sega, because Sega never provided an electronic communication service to the public; it never ran the MAPHIA BBS as a BBS. Additionally, the temporary restraining order did authorize the seizure of documents or correspondence in Sherman's control that relate to the reproduction of the alleged trademarks or copyrighted works, such as the e-mail in question.

## STANDARD FOR GRANTING SUMMARY JUDGMENT

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288–89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Eisenberg*, 815 F.2d at 1289. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 F.2d 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Intel Corp. v. Hartford Accident and Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the party moving for summary judgment meets its initial burden of identifying for the Court the portions of materials on file which it believes demonstrate the ab-

sence of any genuine issue of material fact, the nonmoving party may not rely on mere allegations in the pleadings in order to preclude summary judgment. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assn.*, 809 F.2d 626, 630 (9th Cir.1987).

## DISCUSSION

### I. Copyright Infringement

Sega contends that Sherman is liable for copyright infringement under direct, contributory, and vicarious liability theories. Sherman admits that users of the MAPHIA BBS were allowed to upload and download Sega games with the authorized password, but maintains that this copying fits under the fair use defense because it was nothing more that the use of the games at people's homes, and that any copyright violation was *de minimis*.

### A. Direct Infringement

To establish a *prima facie* case of direct copyright infringement, Sega must prove (1) ownership of a valid copyright in the infringed work, and (2) "copying" by the defendant. *See Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977); *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F.Supp. 1361, 1366–67 (N.D.Cal.1995).

A certificate of copyright registration establishes a presumption that the copyright is valid. 17 U.S.C. § 410(c). Sega has submitted several certificates of copyright registration for its video games, including certificates for Jurassic Park and Sonic Spinball. These certificates establish a presumption that Sega owns a valid copyright in those video game programs. *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 523 (9th Cir.1984).

The Ninth Circuit has held that "copying," for the purposes of copyright law, occurs when a computer program is transferred from a permanent storage device to a computer's random access memory. *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir.1993), *cert. dismissed*, 510 U.S. 1033, 114 S.Ct. 671, 126 L.Ed.2d 640

(1994). In this case, copies were made when the Sega game files were uploaded to or downloaded from Sherman's BBS. Thus, copying by someone is established.

This does not end the inquiry, however, because it does not establish whether Sherman, as the BBS operator, is directly liable for the copying. In *Netcom,* the court found that the Internet provider was not directly liable for copyright infringement of a copyrighted work posted and distributed through its system. *Netcom,* 907 F.Supp. at 1368–70. The *Netcom* court held that "[a]lthough copyright is a strict liability statute, there should be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." *Id.* at 1370. "Where the infringing subscriber is clearly directly liable for the same act, it does not make sense to adopt a rule that could lead to the liability of countless parties whose role in the infringement is nothing more that setting up and operating a system that is necessary for functioning of the Internet," even where the Internet provider has knowledge of potential copyright infringement by its subscribers. *Id.* at 1372–73.

■ While Sherman's actions in this case are more participatory than those of the defendants in *Netcom,* the Court finds *Netcom* persuasive. Sega has not shown that Sherman himself uploaded or downloaded the files, or directly caused such uploading or downloading to occur. The most Sega has shown is that Sherman operated his BBS, that he knew infringing activity was occurring, and that he solicited others to upload games. However, whether Sherman knew his BBS users were infringing on Sega's copyright, or encouraged them to do so, has no bearing on whether Sherman directly caused the copying to occur. *Id.* at 1372. Furthermore, Sherman's actions as a BBS operator and copier seller are more appropri-

ately analyzed under contributory or vicarious liability theories. Therefore, because Sega has not shown that Sherman directly caused the copying, Sherman cannot be liable for direct infringement.[5]

### B. Contributory Infringement

Just because Sherman is not liable for direct infringement, however, does not mean that he is free from liability. Although the Copyright Act does not expressly impose liability on anyone other than direct infringers, courts have long recognized that in certain circumstances, liability for contributory infringement will be imposed. *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261 (9th Cir.1996) (citing *Sony Corp. v. Universal City Studios,* 464 U.S. 417, 435, 104 S.Ct. 774, 785, 78 L.Ed.2d 574 (1984)). Contributory copyright infringement stems from the notion that one who directly contributes to another's infringement should be held liable. *Id.* at 264. Such liability is established where the defendant, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Id.* (quoting *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2nd Cir.1971)); *see also Religious Technology Ctr. v. Netcom On–Line Communication Serv., Inc.,* 907 F.Supp. 1361, 1372 (N.D.Cal.1995) (quoting *Gershwin,* 443 F.2d at 1162).

■ To impose liability on Sherman for contributory infringement, Sega must first establish that the users of Sherman's MAPHIA BBS directly infringed Sega's copyright. Second, Sega must establish that (i) with knowledge of the users' infringing activity, (ii) Sherman induced, caused, or materially contributed to their infringing activity.

#### 1. Direct infringement by MAPHIA BBS users

As discussed above, Sega has established that copies were made when unauthorized

---

5. This holding is consistent with this Court's earlier order, *Sega Enter. Ltd. v. MAPHIA,* 857 F.Supp. 679 (N.D.Cal.1994), which granted preliminary injunctive relief to Sega. In that order, the Court noted that Sega had shown direct copying of its games by someone, and that Sherman knew, facilitated, and encouraged the copying. *Id.* at 686. The Court specifically found

that this activity amounted to contributory copyright infringement. *Id.* at 687. It did not make a similar, specific conclusion of law with respect to direct copyright infringement. To the extent that order can be read to suggest that Sherman may be liable for direct copyright infringement, it is clarified and superseded by this order.

copies of Sega game files were downloaded from, or uploaded to, Sherman's BBS by Sherman's BBS users. Therefore, Sega has established direct copyright infringement by Sherman's BBS users.

### 2. Sherman's knowledge of his users' activities

The standard for the knowledge requirement is objective, and is satisfied where the defendant knows or has reason to know of the infringing activity. *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir.1987) (quoting *Gershwin*, 443 F.2d at 1162.) Here, it is undisputed that Sherman had knowledge that his users were copying the games. Sherman admits that users were allowed to upload and download Sega games from his MAPHIA BBS. Moreover, evidence of a screen printout of user uploading and downloading statistics from the MAPHIA BBS shows that Sherman tracked, or at least had the ability to track, user uploads and downloads. Thus, Sega has established that Sherman knew of the infringing conduct by MAPHIA BBS users.

### 3. Sherman's participation in his users' activities

The Ninth Circuit has recently stated that "providing the site and facilities for known infringing activity is sufficient to establish contributory liability," at least in a swap meet context. *Fonovisa*, 76 F.3d at 264. In this case, Sherman provided the BBS as a central depository site for the unauthorized copies of games, and allowed subsequent distribution of the games by user downloads. He provided the facilities for copying the games by providing, monitoring, and operating the BBS software, hardware, and phone lines necessary for the users to upload and download games.

However, even under an alternative and higher standard of "substantial participation," Sherman is liable. Under this standard, Sherman is only liable if he knew of the users' infringing actions, and yet substantially participated by inducing, causing or materially contributing to the users' infringing conduct. *Netcom*, 907 F.Supp. at 1382. In this case, Sherman did more than provide the site and facilities for the known infringing conduct. He actively solicited users to up-load unauthorized games, and provided a road map on his BBS for easy identification of Sega games available for downloading. Additionally, through the same MAPHIA BBS medium, he offered copiers for sale to facilitate playing the downloaded games. Another court has found that the sale of such copying devices constitutes contributory infringement. *Nintendo of America, Inc. v. Computer and Entertainment, Inc.*, 1996 WL 511619, *4 (W.D.Wash.1996). Moreover, Sherman's business, Parsec Trading, had a policy of providing limited free downloading of games and thereafter selling downloading privileges to customers who had purchased copiers. Thus, Sherman's role in the copying, including providing facilities, direction, knowledge, encouragement, and seeking profit, amounts to a *prima facie* case of contributory copyright infringement.

Because the Court finds that Sega has established a *prima facie* case of contributory copyright infringement liability, it need not address whether Sherman is also liable under the theory of vicarious liability.

### C. Fair Use Defense

Sherman argues that the copying done by the MAPHIA BBS users was fair because there is no evidence that the users went beyond simply playing the games in their own homes, nor any evidence that the users further distributed the games.

Under the fair use defense, there is no infringement, even where a person violates one of the copyright holder's exclusive rights, if that person's use is a fair one. 17 U.S.C. § 107. In determining whether a use is fair, the following four, non-exclusive factors are considered: the purpose and character of the use; the nature of the copyrighted work; the amount and substantiality of the copyrighted work used; and the effect of the use upon the potential market for the copyrighted work. Title 17 U.S.C. § 107; *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 576–80, 114 S.Ct. 1164, 1170–71, 127 L.Ed.2d 500 (1994). Because fair use is an affirmative defense, Sherman carries the burden of demonstrating it. *Acuff–Rose*, 510 U.S. at 589–91, 114 S.Ct. at 1177.

■ In considering this defense, the Court will consider whether Sherman has shown that either his actions or the users' actions constitute fair use. If the users' actions constitute fair use, they will not be considered direct infringers. Then, Sherman cannot be contributorily liable because contributory infringement requires direct infringement by someone. *Fonovisa,* 76 F.3d at 264. If the users' actions do not constitute fair use, Sherman may still avoid liability if his contributing actions qualify as fair use. *Netcom,* 907 F.Supp. at 1378.

### 1. Purpose and character of use

With respect to Sherman's activities, the evidence shows that Sherman encouraged uploading and downloading of Sega's games in order to induce sales of copiers. Such a use is clearly commercial. Sherman intended to profit directly from the content of the information made available on his BBS because his copier customers could use the game files to play the games rather than purchase Sega game cartridges. This distinguishes Sherman from the Internet provider in *Netcom* who did not gain anything from the content of the information available to subscribers. *Id.* at 1379 (fact that the Internet provider did not directly gain anything from the content of the information available to its subscribers on the Internet helps weigh this factor in its favor despite commercial character of Internet provider's use). This factor weighs against a finding of fair use with respect to Sherman's activities.

The BBS users were encouraged to download games from the BBS in order to avoid having to buy video game cartridges from Sega. Such a purpose weighs against the fair use defense. *See American Geophysical Union v. Texaco Inc.,* 802 F.Supp. 1, 14–16 (S.D.N.Y.1992), *aff'd* 60 F.3d 913 (2nd Cir. 1994), *cert. dismissed* — U.S. ——, 116 S.Ct. 592, 133 L.Ed.2d 486 (1995) (no fair use where scientists photocopied publication to avoid cost of purchasing additional copies from publisher). Because the BBS users were able to avoid purchasing the Sega cartridges, their copying is distinguished from that in *Lewis Galoob,* where the users did have to purchase an authorized game cartridge. *See Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.,* 964 F.2d 965, 970 (9th Cir.1992), *cert. denied,* 507 U.S. 985, 113 S.Ct. 1582, 123 L.Ed.2d 149 (1993) (fair use found where users necessarily had to purchase Nintendo's game cartridges in order to use a device called the "Game Genie," which altered features of Nintendo's copyrighted games during home play.)

Furthermore, this case is distinguishable from *Sega Enter. Ltd. v. Accolade, Inc.,* 977 F.2d 1510 (9th Cir.1992), where the court found reverse engineering to be a fair use, in part because the reverse engineering promoted a growth in creative expression. *Id.* at 1523. In contrast, in this case, there is no evidence of any actual reverse engineering or any intent on the part of the users to do so. Thus, the absence of evidence that the copying was creative weighs against a finding of fair use. *Triad Systems Corp. v. Southeastern Express Co.,* 64 F.3d 1330, 1336 (9th Cir.1995), *cert. denied* — U.S. ——, 116 S.Ct. 1015, 134 L.Ed.2d 96 (1996).

### 2. Nature of the copyrighted work

■ This factor provides that the closer the copyrighted work is to the core of intended copyright protection, the more difficult it is to establish the fair use defense. *Acuff–Rose,* 510 U.S. at 586–87, 114 S.Ct. at 1175. In assessing this factor, one consideration is whether the copyrighted work is informational or creative. *Netcom,* 907 F.Supp. at 1379. Because the Sega video games are for entertainment uses and involve fiction and fantasy, which are more creative than informational, consideration of the nature of the copyrighted work weighs against a finding of fair use. *See Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 563, 105 S.Ct. 2218, 2232, 85 L.Ed.2d 588 (1985); *Stewart v. Abend,* 495 U.S. 207, 237–38, 110 S.Ct. 1750, 1768–69, 109 L.Ed.2d 184 (1990); *Playboy Enter., Inc. v. Frena,* 839 F.Supp. 1552, 1558 (M.D.Fla.1993).

### 3. Extent of the work copied

■ The third factor concerns both the percentage of the original work that was copied, and whether what was copied constitutes the "heart" of the copyrighted work. *Netcom,* 907 F.Supp. at 1379 (citing *Harper*

& *Row*, 471 U.S. at 564–65, 105 S.Ct. at 2232–33). Although not a per se rule, the copying of an entire work will ordinarily militate against a finding of fair use. *Id.* (citing *Sony*, 464 U.S. at 449–450, 104 S.Ct. at 792–93).

Here, Sega has shown that the BBS users copied virtually entire copyrighted works by way of their uploads and downloads of Sega games, and that Sherman made these games available through his BBS. While this does not per se preclude a finding of fair use, Sherman has not shown any public benefit nor explanation for the complete copying. *Cf. Sega Enter. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526–27 (9th Cir.1992) (fair use found despite total copying where total copying was necessary to carry out the defendants' beneficial purpose of reverse engineering software to get at the ideas found in the source code). Therefore, this factor weighs against a finding of fair use.

*4. Effect of the use upon the market*

The fourth and final statutory factor concerns whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the copyrighted work. *Campbell*, 510 U.S. at 589–91, 114 S.Ct. at 1177. While all factors must be weighed together, *id.* at 578–80, 114 S.Ct. at 1171, the fourth factor is the most important consideration. *Los Angeles News Service v. Tullo*, 973 F.2d 791, 798 (9th Cir.1992) (citing *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233–34).

By utilizing the MAPHIA BBS, users are able to download and distribute one or more copies of Sega video game programs from a single copy of a Sega video game program on the MAPHIA BBS, and thereby obtain unauthorized copies of Sega's copyrighted video game programs.

This unauthorized copying of Sega video game programs works to decrease Sega's sales of video game cartridges. The Super Magic Drives could be used for copying Sega's video game programs onto disks. Sherman admits users were allowed to upload and download Sega games through the MAPHIA BBS onto magnetic media like floppy disks, and that users who had Sega

games on disks could play them directly using the copiers. The copiers sold and advertised by Sherman through his business Parsec Trading came with downloading privileges to the purchaser, giving the purchaser the ability to copy Sega copyrighted video game programs from the MAPHIA BBS. Copier purchasers were thus able to duplicate and play the games without purchase of Sega game cartridges. The copiers in conjunction with the MAPHIA BBS supplanted the need to purchase the genuine Sega video games.

While Sherman contends that the copiers have other non-infringing uses, the Court is unpersuaded by this argument. It is unlikely that customers would pay $350 to back up the Sega game cartridges, which are not susceptible to breakdown and which sell for between $30 and $70. The Court finds that the only substantial use of the copiers is to avoid having to buy video game cartridges from Sega by copying the video game program and playing such unauthorized, copied games. *See Nintendo*, 1996 WL 511619 at *4 (finding that there were no substantial non-infringing uses for a game-copying device such as the Super UFO, which copies Nintendo games from cartridges to disk).

Sherman also argues that, because there are only a limited number of BBS users that have copiers, and these users would likely play the games only in their own homes, their use should be considered *de minimis*. He contends that because there is no evidence that these users are further distributing the games, these users' actions cannot be considered to have a tendency to dilute Sega's sales.

The Court finds this argument unpersuasive. Even if the users are only playing the games in their own homes and even if there are currently only a limited number of users that have copiers, unrestricted and widespread conduct of this sort would result in a substantial adverse impact on the market for the Sega games. *See Playboy*, 839 F.Supp. at 1558–59 (finding that providing a BBS from which users could and did download Playboy copyrighted pictures would adversely affect the market if the conduct became

widespread.) By downloading the games from the BBS, users avoid paying for the games. Sherman's conduct in providing the BBS for uploading and downloading games, and offering for sale the copiers on which to play these unauthorized games, facilitated the users' conduct. This conduct, if widespread, would adversely impact the market for Sega games.

### 5. Analysis

All of the factors discussed above weigh against the application of the fair use defense. Because the fair use defense does not apply, and Sega has met its burden to show contributory copyright infringement by Sherman, the Court GRANTS Sega's motion with respect to its copyright claim.

### D. Willfulness

Sega contends that Sherman's actions show that he willfully infringed upon their copyrights, which would entitle it to greater damages under 17 U.S.C. § 504(c)(2).

■ Infringement is willful if the responsible party acts with knowledge that he or she is infringing a copyright. *Peer Intl. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335 (9th Cir.1990), *cert. denied* 498 U.S. 1109, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991); *Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d 1366, 1382 (2nd Cir.1993). Willfulness may also be found where the defendant's infringing actions are undertaken with reckless disregard for the copyright holder's rights. *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1020–21 (7th Cir.1991), *cert. denied* 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). Such knowledge may be inferred from the defendant's conduct. *N.A.S. Import, Corp. v. Chenson Enter., Inc.*, 968 F.2d 250, 252 (2nd Cir.1992). Generally, a determination as to willfulness requires an assessment of a party's state of mind, a factual issue that is not usually susceptible to summary judgement. *Silverman v. CBS Inc.*, 632 F.Supp. 1344, 1352–53 n. 11 (S.D.N.Y.1986), *modified* 870 F.2d 40 (2nd Cir.1989); *see also Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 515 (9th Cir.1985), *cert. denied* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990) (a finding of willfulness is a factual determination).

■ Here, however, the evidence shows that Sherman willfully infringed upon Sega's copyright. He used, or knowingly allowed others to use, the Sega mark to identify Sega games on the Maphia BBS. He knowingly allowed others to upload and download the Sega games, and expressly solicited others to upload games to his BBS. He offered for sale copiers that play and copy Sega downloaded games from disks. His business, Parsec Trading, sold or planned to sell copiers. Parsec Trading had a policy of giving customers limited free downloads after they had purchased a copier. This evidence shows that Sherman intentionally contributed to the users' infringement of Sega's copyright, and that he intended to profit in sales of copiers. Sherman has offered nothing to rebut this evidence. Therefore, the Court finds that Sherman's contributory copyright infringement was willful.

### II. Federal Trademark Infringement

■ Sega maintains that the evidence establishes that Sherman has violated federal trademark infringement law under the Lanham Act, 15 U.S.C. § 1114. Specifically, Sega maintains that Sherman is liable for trademark counterfeiting because Sherman willfully used Sega's mark in connection with the counterfeit games available on Sherman's BBS. Sherman maintains that neither the use of the name "Sega" for purposes of identifying the contents of a file, nor the incidental appearance of the SEGA trademark when a user plays a game downloaded from his BBS, violates the trademark laws.

### A. Prima Facie Case

Under the Lanham Act, 15 U.S.C. § 1114, any person is liable for trademark infringement if that person, without the consent of the trademark registrant:

(a) use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which use is likely to cause

confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114.

A *prima facie* case for trademark infringement under the Lanham Act is established by a showing that (1) the mark is owned by or associated with a particular plaintiff, and (2) the defendant's use of the mark is likely to cause confusion or mistake among the public as to the origin of the goods. *New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1201–02 (9th Cir.1979); *see also Jockey Club, Inc. v. Jockey Club of Las Vegas,* 595 F.2d 1167 (9th Cir.1979). The latter element can be broken down into two requirements: (a) that use of the mark is likely to cause confusion, and (b) that the defendant used the mark. *See Alchemy II, Inc. v. Yes! Enter. Corp.,* 844 F.Supp. 560, 569 (C.D.Cal.1994) (citing *HMH Publishing Co. v. Lambert,* 482 F.2d 595, 598 (9th Cir. 1973)).

### 1. Ownership

Sega owns the SEGA trademark which is the subject of Federal Trademark Registration No. 1,566,116. Sega's federal trademark registration is conclusive evidence of Sega's exclusive right to use the registered mark in commerce. 15 U.S.C. § 1115.

### 2. Likelihood of Confusion

The Ninth Circuit has adopted the following factors to determine whether a likelihood of consumer confusion exists: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of product lines. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979). Because each of these factors is not necessarily relevant to every case, the list functions as a guide and is neither exhaustive nor conclusive. *Metro Pub., Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th Cir.1993). Therefore, the Court will only address those factors relevant to this case.

#### a. Proximity of goods

First, the games downloaded from the MAPHIA BBS are substantially identical to genuine Sega games. The greater the similarity between the two products, the greater the likelihood of confusion. *See Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 505 (5th Cir.1980).

#### b. Similarity of marks

Here, there is no issue as to the similarity of the mark. The mark displayed when the unauthorized games are played is identical to Sega's actual trademark. This exact identity constitutes a counterfeit mark. Moreover, the same word, "Sega," the only word in the SEGA trademark, appears as part of the file descriptors used to identify the game files and in the name of the file area on Sherman's BBS that contains the games.

#### c. Intention in adopting the mark

Evidence suggests that Sherman intentionally used or adopted the mark. He created a file area on his BBS that was entitled "Maphia—Sega." He used, or knowingly allowed others to use, the word Sega to identify SEGA games on the MAPHIA BBS, and solicited others to upload games to his BBS. He was aware that the Sega trademark appeared when games downloaded from his BBS were played. His business also sold game copiers that played these games, and had a policy of providing free downloads to each customer. His knowledge that Sega games were being uploaded and downloaded from his BBS, along with his participation in a business that sold copiers that played these games shows that he intended to profit by using the mark. Such intention amounts to willfulness. In the Ninth Circuit, a defendant's knowing adoption of a mark similar to the plaintiff's raises a presumption of confusion. *Harley–Davidson, Inc. v. Seghieri,* 29 U.S.P.Q.2d 1956, 1993 WL 645930 (N.D.Cal. 1993) (citing *Sleekcraft,* 599 F.2d at 341.).

#### d. Actual confusion

While Sega has not shown any evidence of actual confusion, the Ninth Circuit has held that "neither actual confusion nor intent are necessary to finding a likelihood of

confusion under the Lanham Act." *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d at 1201–02. Similarly, Sega need not show that users of the BBS are likely to be confused. Once a product is put into commerce, likelihood of confusion, mistake, or deception occurring at some future time is sufficient to establish liability for trademark infringement. *Rolex Watch U.S.A., Inc. v. Canner*, 645 F.Supp. 484, 492 (S.D.Fla.1986).

### e. Analysis

Based on the factors discussed above, the Court finds that there is a likelihood of consumer confusion regarding the sponsorship and origin of the game files available on the MAPHIA BBS. The exact mark registered to Sega appears when games files downloaded from Sherman's BBS are played. These games files are identified in their file descriptor with the word Sega, the only word that is used in the Sega trademark, and are virtually identical to Sega's games. These facts are very similar to the facts in *Playboy*, in which the court held the defendant liable for trademark infringement because files containing Playboy photographic images were loaded on his BBS and were identified in their file descriptions with the Playboy trademark. *Playboy*, 839 F.Supp. at 1559–61. Any member of the public that logged onto Sherman's BBS was likely to think that the trademark indicated that the games were sponsored by or affiliated with Sega. Additionally, any member of the public who played such a game using a copier, such as those sold by Sherman, was also likely to be confused as to whether the game played with the copier was sponsored by, or affiliated with Sega.

### C. Use of the Mark

Here, Sega has established that Sherman used or adopted Sega's mark on his BBS. Sherman knew the word Sega was used to identify game files, he had used the word Sega to identify a file area for the games on his BBS, and he knew that the SEGA logo appeared when the downloaded games were played.

Again, these facts are similar to the facts in *Playboy*, 839 F.Supp. 1552 (M.D.Fla.1993). The *Playboy* court held that the defendant

had infringed the "Playboy" mark because he knew that the mark was used to identify copyrighted Playboy photograph files on his BBS, despite the defendant's contention that he himself never placed the word "Playboy" onto his BBS. *Id.* at 1561. In essence, the *Playboy* defendant had tacitly authorized the use of the mark on his BBS.

Following the reasoning of *Playboy*, the Court finds that Sherman adopted the use of the Sega name as file descriptors on his BBS and the SEGA logo within the games, because he knew about the use, and tacitly authorized it. Additionally, Sherman used the mark when he created the file area that used the name Sega to identify the area where the game files would be located.

Sherman's knowing adoption or authorization of use of the Sega mark on his BBS distinguishes this case from *Sega Enterprises, Ltd. v. Sabella*, C93–04260 CW, where the defendant BBS operator declared that she neither knew the mark was being used on her BBS, nor had ever used the mark herself in any of her BBS operations.

### D. Conclusion

Sega has shown that it owns the SEGA mark, that Sherman used, adopted, or authorized the use of the mark on his BBS, and that his use created a likelihood of consumer confusion.

Nonetheless, Sherman argues that: (1) the use of the Sega name in the file descriptors is merely a file identifier; (2) the appearance of the trademark when the games are played is incidental; and (3) the games are genuine games as opposed to counterfeit, and therefore not subject to the Lanham act.

In light of *Playboy*, however, the Court finds unpersuasive Sherman's assertion that the Sega name was merely a file identifier. Furthermore, Sherman's contention that the copying of the SEGA trademark is incidental to the copying of the game is irrelevant to determine whether the trademark causes a likelihood of consumer confusion. Finally, the game files available on Sherman's BBS cannot be considered "genuine" for the purposes of the Lanham Act because they were distributed in an unauthorized manner and

were not subject to Sega quality controls. *Hunting World Inc. v. Reboans, Inc.*, 24 U.S.P.Q.2d 1844, 1849, 1992 WL 361741 (N.D.Cal.1992).

The Court holds that the use of the Sega name to identify the game files and the use of the SEGA mark in the unauthorized, virtually identical games creates a likelihood of consumer confusion as to whether Sega endorsed or sponsored the games appearing on or downloaded from MAPHIA. Accordingly, Sega has established a *prima facie* case that Sherman's use of Sega's trademark on virtually identical Sega game programs constitutes counterfeiting. Furthermore, the Court holds that the evidence shows that Sherman's adoption of the mark was willful. Upon such a *prima facie* showing, Sherman must come forward with "specific facts" showing there is a genuine issue regarding Sega's trademark infringement claim. Sherman has failed to do so. Sega is entitled to summary judgment of trademark infringement.

### III. False Designation of Origin

15 U.S.C. § 1125(a) provides:

Any person who, on or in connection with any goods or services, uses in commerce any word, term, name, symbol ... or any combination thereof, or any false designation of origin ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person ... as to the origin, sponsorship, or approval of his or her goods ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such an act.

To prevail on its false designation claim under the Lanham Act, Sega must similarly establish that the public is likely to be deceived or confused by the similarity of the marks. *Id.* For the same reasons set forth regarding Sega's trademark infringement claim, Sherman's use of the Sega trademark is likely to be confusing and to cause damage to Sega and, therefore, Sega is entitled to summary judgment regarding Sherman's liability under 15 U.S.C. § 1125(a).

### IV. State Law Trade Name Infringement Claim

Sega claims that Sherman is liable for California trade name infringement under Cal.Bus. & Prof.Code §§ 14401 *et seq.* Section 14402 provides that "[a]ny court of competent jurisdiction may restrain, by injunction, any use of trade names in violation of the rights defined in this chapter." Cal.Bus. & Prof.Code § 14402. Section 14415 provides that the filing of articles of incorporation creates a rebuttable presumption that the corporation has the exclusive right to use its corporate name as a trade name. Cal. Bus. & Prof.Code § 14415.

"In both trademark and trade name cases, the test of infringement is whether a likelihood of confusion exists." *Jockey Club, Inc. v. Jockey Club of Las Vegas, Inc.*, 595 F.2d 1167, 1168 (9th Cir.1979). For the reasons set forth above, Sega has established that a likelihood of confusion exists with the use of Sega's trade name on Sherman's BBS. The Court GRANTS Sega's motion with respect to this claim.

### V. State Unfair Competition Claim

Sega is also entitled to summary judgment regarding Sherman's liability for unfair competition under California Business and Professions Code § 17200, *et seq.* Section 17200 defines unfair competition as any unlawful, unfair, or fraudulent business practice and unfair, deceptive, untrue or misleading advertising. Cal.Bus. & Prof.Code § 17200.

Unfair competition claims made pursuant to Cal.Bus. & Prof.Code § 17200 are substantially congruent to claims made under the Lanham Act. *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir.1994). Therefore, for all the reasons set forth above, the Court GRANTS Sega's motion with respect to this claim.

### VI. Remedies

#### A. Injunctive Relief

Sega is entitled to injunctive relief under copyright, trademark, and state trade name law.

A court may order a permanent injunction "to prevent or restrain infringement of [the owner's] copyright." 17 U.S.C. § 502. Generally, a showing of copyright infringement liability and the threat of future violations is sufficient to warrant a permanent injunction. *MAI Systems,* 991 F.2d at 520. Here, Sherman's contributory infringement of Sega's copyright, combined with the return of Sherman's computer equipment to him, constitutes a threat of continued violations absent an injunction. Specifically, because Sherman maintains the computer and other equipment necessary to run his BBS and may continue in the facilitation of the uploading and downloading of Sega game programs, there is a threat of continued violation. Therefore, Sega is entitled to permanent injunctive relief. This relief applies with respect to all of its copyrighted video games. *See Encyclopaedia Britannica Educational Corp. v. Crooks,* 542 F.Supp. 1156, 1187–88 (W.D.N.Y. 1982).

Additionally, pursuant to 15 U.S.C. § 1116, Sega is entitled to a permanent injunction to prevent the violation of its trademark rights. Finally, Sega is also entitled to a permanent injunction enjoining Sherman from using its Sega trade name on his BBS. Cal.Bus. & Prof.Code § 14402. When judgment is entered in this case, the preliminary injunction presently in place will be entered as a permanent injunction.

### B. Monetary Damages For Copyright Infringement

#### 1. Statutory damages

The Copyright Act, 17 U.S.C. § 504, provides that the copyright holder may elect either actual damages or statutory damages as a remedy for copyright infringement. *Harris v. Emus Records Corp.,* 734 F.2d 1329, 1335 (9th Cir.1984). Sega has elected to seek a statutory damage award under 17 U.S.C. § 504(c)(2).

The Copyright Act provides that where the infringement was committed "willfully," as is the case here, the court in its discretion may award statutory damages in a sum of not more than $100,000 for the infringement of each particular work. 17 U.S.C. § 504(c)(2). The court has wide discretion in determining the amount of statutory damages to be awarded. *Nintendo of America, Inc. v. Dragon Pacific Intl.,* 40 F.3d 1007, 1010 (9th Cir.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 2256, 132 L.Ed.2d 263 (1995).

■ In *Dragon Pacific,* the court found that a statutory damage award of $5000 for the defendant's willful infringement of one of Nintendo's video games was appropriate. *Id.* Because this case is similar to *Dragon Pacific* in that they both involve the willful infringement of similar types of video games, the Court finds that a statutory award of $5000 per infringed work is appropriate. Here, Sega has established that at least two of its copyrighted video games were infringed, namely Jurassic Park, and Sonic Spinball. Therefore, the Court awards statutory damages in the amount of $10,000.

#### 2. Attorneys' fees and costs

Under 17 U.S.C. § 505, the Court may in its discretion award the prevailing party reasonable attorneys' fees and costs. In determining whether to grant attorneys' fees, the Court may consider the degree of success obtained by the prevailing party; frivolousness; motivation; objective unreasonableness in both the factual and legal arguments of the case; the need in the particular circumstance to advance considerations of compensation and deterrence; and promotion of the Copyright Act's objectives. *Jackson v. Axton,* 25 F.3d 884, 890 (9th Cir.1994). Exceptional circumstances are not a prerequisite to such an award. *Historical Research v. Cabral,* 80 F.3d 377, 378 (9th Cir.1996). Additionally, while willful infringement is an important factor favoring an award of fees, it does not, in itself, compel an award. *Id.* at 379.

■ In this case, the factors weigh in favor of granting costs and attorneys' fees. Sega is the prevailing party in its copyright claim. Several of Sherman's arguments for denying copyright infringement liability and for objecting to the evidence are weak or irrelevant. He had knowledge of the infringing activity, and willfully encouraged it. He also participated in the sale of copiers that did not have any substantial non-infringing

uses. All of these factors weigh in favor of an award of attorneys' fees.

Moreover, the award of attorneys' fees may help prevent future copyright infringements like the one at issue here. Active BBS operators like Sherman who (1) know that unauthorized copies of copyrighted software are being uploaded to and downloaded from their BBSs, (2) are also selling products whose only substantial use is to run such software, and (3) have linked their sale of such products to downloading privileges where users may get unauthorized copies of the software, should be held accountable. Unchecked, this type of activity could quickly cause widespread, unauthorized distribution of a copyright holder's software and adversely impact the market for the work. The Copyright Act's objective of encouraging production of such work is better served in this case by discouraging Sherman's actions to the fullest extent possible.

The Court GRANTS Sega's request for an award of attorneys' fees with respect to its copyright infringement claim. Sega may file a post-judgment motion for fees in accordance with Local Rule 54–5.

### C. Monetary Recovery For Trademark Infringement, False Designation Of Origin And Unfair Competition

The Ninth Circuit has held that where trademark infringement is deliberate and willful both the trademark owner and the buying public are slighted if a court provides no greater remedy than injunctive relief. *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123–24 (9th Cir. 1968) *cert. denied*, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968); *see also Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir.1993), *cert. denied* 510 U.S. 815, 114 S.Ct. 64, 126 L.Ed.2d 34 (1993). Under 15 U.S.C. § 1117(a), monetary remedies in trademark infringement cases include (1) an award of the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. *Intel Corp. v. Terabyte Intl., Inc.*, 6 F.3d 614, 620 (9th Cir.1993) (citing *Lindy Pen Co.*, 982 F.2d at 1405). In counterfeiting cases, the Court is required, absent extenuating circumstances, to award treble damages or profits, whichever is greater, along with reasonable attorneys' fees. 15 U.S.C. § 1117(b).

As discussed previously, the evidence shows that Sherman willfully infringed Sega's trademark and that the infringement was willfully calculated to exploit the advantages of Sega's mark in order to increase Sherman's copier sales. In such cases an award of damages or profits is appropriate. *Lindy Pen. Co.*, 982 F.2d at 1405. Additionally, the evidence shows that Sherman's infringement amounted to counterfeiting. As no extenuating circumstances have been offered or are evident, the Court holds that Sega is entitled to treble damages or profits, plus reasonable attorneys' fees.

Sega has presented no evidence regarding its damages or profits. If Sega wishes to prove actual damages or lost profits, the matter will be referred to the Chief Magistrate Judge or his designee to hold a hearing on this issue. Sega shall inform the Court and Sherman of its intentions in this regard within one week of the date of this order. If Sega does not so respond, the Court will enter judgment.

### CONCLUSION

For the reasons previously stated, the Court GRANTS Sega's motion for summary adjudication of liability on all of its claims. The Court also GRANTS Sega's request for a permanent injunction prohibiting further copying of Sega games by way of a BBS run by Sherman.

IT IS SO ORDERED.